**TELOS VG, PLLC**
John H. Bogart (08305)
R. Lee Saber (11020)
299 South Main Street, Suite 1300
Salt Lake City, UT  84111
Telephone:  (801) 535-4304
jbogart@telosvg.com
lsaber@telosvg.com
  Attorneys for Plaintiff

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| In2 Networks, Inc., a Utah limited liability company,<br><br>         Plaintiff,<br><br>      vs.<br><br>Honeywell International, Inc., a Delaware company,<br><br>         Defendant. | **FIRST AMENDED COMPLAINT**<br><br>Case No. 2:11-cv-00006-TC<br><br>Judge Tena Campbell |

In2 Networks, Inc. ("In2"), by and through its attorneys of record, hereby alleges and states as follows:

**PARTIES**

1. In2 is a Utah corporation.  In2 develops software and hardware products, technology, and services for internet controllable home security and environmental control systems.

2. Honeywell International, Inc. ("Honeywell") is a Delaware corporation authorized and doing business in the State of Utah.  Honeywell controls more than 50%

of the home security systems market in the United States and in Utah and more than 50% of the home environmental control systems market in the United States and in Utah.  Honeywell controls between 75% and 90% of the internet controlled home security and internet controlled home environmental control systems submarkets in the United States and in Utah.  Home environmental control systems control both security and thermostat systems.  The home security systems market consists of electronic home security systems, typically including window and door alarms, often connecting to offsite monitoring, and includes a submarket of internet controllable home security systems.  The home environmental control system market consists of electronic systems controlling home thermostats and includes a submarket of internet controllable home environmental control systems.  See Exhibit 1 (Honeywell Announcement, June 21, 2011).

## JURISDICTION & VENUE

3. This Court has jurisdiction of this matter because the contracts and conduct at issue in this case were executed and/or performed in Utah, and the plaintiff is located and was injured in Utah. The Court has jurisdiction over state law claims pursuant to 28 U.S.C. §1332(a) as Plaintiff and Defendants are of diverse citizenship and the amount in controversy exceeds $75,000.

4. Venue is proper in the District of Utah under 28 U.S.C. §1391(b) and 15 U.S.C. §22 because Defendants transact business, committed an illegal or tortious act,

have an agent, or are found in this District, Plaintiffs is located in this District, and a substantial portion of the events described in this Complaint occurred or were carried out in this District.

## FACTS

5. In2 developed Vista ICM and Energy ICM hardware and software systems. ICM systems enable an owner to control the security and environmental control systems via a web-based internet interface. The ICM systems are compatible with the Honeywell series of security and environmental control systems.

6. In2 paid for the hardware development costs including schematic, layout and prototype boards and the firmware engineering development costs, including custom drivers to enable its ICM systems to communicate with the Honeywell Vista security system.

7. In2 entered into an OEM Supply and License Agreement dated June 1,2006 signed by Honeywell's Gordon Hope. The following year, however, in March 2007, Honeywell required In2 to execute a Bailment and Services Agreement ("Bailment Agreement") replacing the OEM Supply and License Agreement. Honeywell's Director of Marketing Al Lizza promised to sell 28,000 Vista ICM units generating approximately $2.9M revenue to In2 during the first 36 months of product sales. Although this promise was the consideration to In2 for entering into the Bailment Agreement with Honeywell, Honeywell did not keep this promise. Execution of the Bailment Agreement was otherwise a unilaterally imposed condition imposed by Honeywell as part of plan to

financially cripple In2 and thereby exclude it from competition for internet controllable security and environmental systems. Honeywell purchased and sold just 6,000 units of the In2 Vista ICM device through January 2010, nowhere near the promised 28,0000. Without the promised sales the Bailment Agreement was of no financial value to In2.

8. In2 developed the www.in2myhome.com and www.in2mybusiness.com web portal services. These web portal services are compatible with the Vista ICM. They enable customers to purchase In2 services for web based remote access to Honeywell security systems using the Vista ICM.

9. In2 custom engineered the required updates to the www.in2myhome.com web service to support email notification when and as requested by Honeywell. Honeywell agreed to transition the Honeywell branded Vista ICM product to an In2 branded product in 2010. Honeywell later breached that promise, and also barred In2 from introducing its products and published false and defamatory statements about In2, preventing In2 from entering the internet capable security and environmental control system submarkets.

10. Honeywell agreed to and advertised In2's email service for Vista ICMs outside the In2 warranty period of 18 months as a "pay service". Honeywell paid In2 $12,000 per month for 5 months from September 2009 – January 2010 for email services of Vista ICM customers. In December 2009, Honeywell sent approximately 1,000 letters to every dealer who had purchased the In2 Vista ICM product notifying them that the Security system email notification service would be a

paid service through In2 Networks effective January 1, 2010.

11. In January 2010, just one month later, Honeywell sent out letters entitled "Discontinuation of VISTA ICM product – effective immediately." This January 2010 letter stated "This notice supersedes the notice on the VISTA ICM e-mail alert messaging sent out in December, 2009". The January 2010 letter falsely claimed that the Vista ICM was "obsolete." In fact, the ICM was not obsolete; it was fully functional and effective in the market-place. The letter was intended to interfere with In2's ability to market its internet products, to damage its reputation, and thereby prevent entry into the market distinct from Honeywell.

12. Honeywell went on to disparaged the In2 Vista ICM by claiming, again falsely, that "Unfortunately, Honeywell is forced to take this action in light of recent concerns regarding our third-party supplier's ability to continue to provide long-term support of the VistaICM units and email messaging". In fact, Honeywell had no such genuine concerns. The statement was intended to disparage In2, harm its reputation and ability to compete, and to smooth the path for Honeywell to introduce a competing product based on the In2 work and products.

13. Brian Casey and Josh Foster (Honeywell corporate counsel) informed In2 after these defamatory letters had been sent that Honeywell had also discontinued all sales, service and support of the Vista ICM. Mr. Casey and Mr. Foster further stated that Honeywell would not permit In2 to sell the Vista ICM as an In2 branded product despite prior agreements and promises to In2 that it would be able to market the ICM

4

products. Honeywell took these steps in an effort to prevent In2 from entering the internet security and environmental control submarkets and to ensure that In2 could not compete in an after-market for internet controllable security and environmental control systems.

14.     Following the false and disparaging January 2010 letter, Mr. Casey, as the agent of Honeywell, agreed that Honeywell would continue to sell the Vista ICM to selected dealers, but refused to withdraw the announcement of discontinuation of the product per the letter sent January 2010. Honeywell breached that promise as well, refusing either to sell In2 ICM products or to allow In2 to serve dealers directly. Honeywell refused to release any dealer information to In2 concerning Vista ICM sales and refused to release any dealer information to In2 for In2 branded products. Honeywell's refusal blocked In2 from entering the market independently of Honeywell.

15.     The Vista ICM was sold throughout the US, Canada, Europe, India and Australia. The Vista ICM was sold directly to dealers in the Caribbean, Central America, Latin America and South America. Honeywell, without justification or reasonable cause, terminated sales of the Vista ICM in these regions January 18, 2010. In2 developed other complimentary products that are compatible with the Vista ICM to provide a complete home control solution that includes Security, Thermostats, Lighting, Power and Music control. In2 also sold In2 branded Thermostat ICM, Lighting ICM, Music ICM and Vizia ICM units through ADI.

16.     In January 2010, Honeywell required all of its units to refuse to purchase products from In2.  ADI's product manager confirmed that he was directed by Honeywell management to terminate all relations with In2 and refused to allow In2 to run any promotions with ADI.  Honeywell's Josh Foster confirmed that he had advised ADI product managers not to deal with In2.  ADI ceased ordering all In2 products for over 4 months.

17.     In2 requested that Honeywell allow In2 to sell the Vista ICM under the In2 brand, but Honeywell demanded that In2 stay out of the market and not compete against Honeywell in any way.

18.     After Honeywell terminated all relations with In2 and closed it out of the market, in particular the internet controllable home security and home environmental control system submarkets, Honeywell began offering a competing web service product modeled on the In2 products.  Honeywell's products were developed under the direction of Gordon Hope who originally executed the agreement with In2 for the Vista ICM and oversaw interactions between Honeywell and In2.  Mr. Hope was intimately familiar with all of the features of the In2 products, including the pricing and intellectual property incorporated into them.  He now runs the division that copied the In2 products, marketing Honeywell's products based on the In2 systems.  Honeywell exploited its power over In2 to extract In2 expertise and development, took the work for its own, and now is directing the exclusion of In2 from competition.

19.     The Total Connect products were not introduced into the market until

more than 2 years after the Vista ICM began shipping. The Total Connect product has copied each of the features of the In2 systems including email notification, remote alarm controls, PDA/Phone access under the direction of Mr. Hope. All of the features were developed by In2 and only later copied by Honeywell based on misappropriation of In2 intellectual property.

20. Honeywell has stifled competition by "strong arming" In2 out of the market and improperly terminating the Vista ICM product.

21. Mr. Casey acknowledged that Honeywell continues to sell the Vista ICM product to select dealers. This is clear evidence that Honeywell's claimed "concerns" were and are mere pretense, and that the real purpose of the disparaging letters was to harm In2, poison the market against it, and prevent it from effectively entering into competition in the internet security and environmental control systems.

22. Honeywell acknowledged that Vista ICM email service is part of the Vista ICM product warranty and such service does not need to be continued past the original In2 warranty period of 18 months. Nevertheless, Honeywell has threatened litigation against In2 if email service is discontinued after the In2 warranty period, again showing that the January 2010 letter was a fraud and part of a plan to prevent In2 from entering the market.

23. In2 has invested significant financial and engineering resources into the Vista ICM and has now been prohibited by Honeywell from selling its products.

24. In2 licensed the Honeywell EnviraCOM protocol which is used to

communicate with Honeywell VisionPro IAQ thermostats. In2 developed, engineered, and sold an Energy ICM providing internet control of the Honeywell VisionPro IAQ thermostats. In2 distributes the Energy ICM through both Honeywell owned ADI and through numerous Heating/Cooling wholesale distributors.

25. Honeywell requested In2 sell a Honeywell branded Energy ICM to compliment their Custom Electronics business. Tim Trautman, the Product Manager for Honeywell, gave In2 assurances of sales of 6,750 units over first 36 months, generating $1.07 million revenue to In2. Based on Honeywell's promise, In2 purchased materials including product inventory and custom Honeywell branded packaging.

26. Honeywell generated purchase orders and further committed to In2 their intention to launch the Energy ICM product. Honeywell confirmed that purchase orders were in fact generated. Honeywell, however, failed to honor its commitment to launch the Energy ICM and did not send In2 any of the purchase orders. As a direct result, In2 incurred damages including excess inventory, lost revenue, costs associated with spent engineering and marketing resources, and custom Honeywell printed materials.

27. In2 actively engaged with outside sales rep firms including Ridgeline Mechanical and EDOS to assist In2 in marketing and selling the In2 branded Energy ICM. Honeywell Vice President and General Manager John Tyhacz prohibited these outside rep firms from engaging with In2, including EDOS. In April 2010, John

Tyhacz told the owner of EDOS that Honeywell would terminate their representation agreement if they engaged with In2.  The only explanation for this threat is that it is part of an effort by Honeywell to ensure that In2 cannot enter the market for internet controllable home security and environmental control systems.  Mr. Tyhacz's actions have caused damages to In2 by threatening the rep firms and not preventing them from independently engaging with In2.

28. In2 then proposed that Honeywell acquire the Energy ICM technology platform. During the negotiations, Pat Tessier threatened In2, demanding that it accept any conditions imposed by Honeywell or Honeywell would develop their own competing product and put In2 out of business.  Honeywell then agreed to review the In2 technology.  In2 executed a Non-Disclosure Agreement ("NDA") with Honeywell for the due diligence review of In2 technology, software and intellectual property. The NDA required that any information exchanged between the parties or otherwise disclosed was intended only for the due diligence review.

29. Honeywell performed a sham review.  It reviewed the wrong software platform and then refused to perform any review of the actual software outlined in the technology acquisition proposal even after In2 pointed out Honeywell's "error."  John Tyhacz notified In2 that "The reality is we have closed the project and will not reopen it for any reason".

30. Honeywell expressly directed wholesalers and retailers to refuse to sell, stock, or service In2 products.  Whether voluntarily or in response to

Honeywell's threats and coercion, wholesalers and retailers joined Honeywell in boycotting In2, refusing to do business with In2 and preventing it from entering the relevant markets.

31. Honeywell structured its contracts with In2 so as to require In2 to make all sales and marketing through Honeywell, and which barred In2 form offering products or services in competition with products or services offered by Honeywell.  The effect of these provisions has been to bar In2 from competing in the internet controllable home security and home environmental control systems submarkets. The provisions bar In2 from attempting to sell its products to the over 5 million users in the after-market for home security and home environmental control systems.

32. The consideration for entering into the Bailment Agreement included the promise by Honeywell that In2 products would be sold by Honeywell under an In2 brand and that In2 would be able to bring its products to market directly should Honeywell decide to develop its own internet control system.

33. Honeywell induced In2 to invest in Honeywell-specific systems in order to ensure that In2 could not later develop a competing line of products and could not offer its products to Honeywell competitors.  Once Honeywell had obtained In2's commitment to developing products and services for Honeywell systems and In2 could not either shift to direct competition with Honeywell or to providing products and services to Honeywell competitors, Honeywell discontinued doing business with In2, introduced its own products, refused to offer In2 products, and orchestrated a campaign to induce

independent dealers and wholesalers to boycott In2 on pain of losing all Honeywell business.

## CLAIMS

### FIRST CAUSE OF ACTION

**(Interference with Economic Relations)**

34. In2 hereby incorporates paragraphs 1 through 33, inclusive, as though set forth in full.

35. Honeywell intentionally interfered with existing economic relations between In2 and In2's customers, distributors, and vendors. Honeywell disparaged In2 to In2 customers through publication of false statements about In2 and In2 products. Honeywell also threatened dealers and wholesalers, including Ridgeline Mechanicals, who had been doing business with In2, destroying In2's ability to sell products to existing customers. Honeywell's threats and other conduct were done with the purpose of injuring In2 and are not privileged. Honeywell's threats and disparagement of In2 are improper means.

36. As a direct result, In2 was damaged and materially harmed, *inter alia*, by lost service contracts, and other termination of agreements.

### SECOND CAUSE OF ACTION

**(Interference with Prospective Economic Gain)**

37. In2 here incorporates paragraphs 1 through 36, inclusive, as though set forth in full.

38.     Honeywell intentionally interfered with prospective economic relations between In2 and its actual and prospective customers and distributors. Honeywell disparaged In2 to In2 customers and potential customers through publication of false statements about In2 and In2 products.  Honeywell also threatened dealers and wholesalers who had done or considered doing business with In2, including Ridgeline Mechanicals, destroying In2's ability to sell products to existing or new customers.  Honeywell misappropriated In2 intellectual property to create products and used financial leverage to prevent In2 from marketing its products.  Honeywell's threats and other conduct were done with the purpose of injuring In2, an improper purpose, and are not privileged. Honeywell's threats and disparagement of In2 are improper means.

39.     As a direct result, In2 was damaged, inter alia, by lost sales and prospective sales, prospective service contracts, and other opportunities.

## THIRD CAUSE OF ACTION

### (Business Disparagement)

40.     In2 hereby incorporates paragraphs 1 through 39, inclusive, as though set forth in full.

41.     Honeywell's false and disparaging letters about In2 products and services caused material injury to In2's reputation, lost sales and prospective sales, lost service contracts, and other opportunities.  Honeywell's disparaging statements were made in reckless disregard for the truth, and were known to Honeywell to be false

when made.  In the alternative, Honeywell was negligent or grossly negligent in making the disparaging statements.

42. Honeywell made false and disparaging statements about In2 and In2's products and services, intentionally and with the purpose of injuring and extinguishing In2's business.

## FOURTH CAUSE OF ACTION

### (Breach of Contract)

43. In2 here incorporates paragraphs 1 through 42, inclusive, as though set forth in full.

44. Honeywell breached the Bailment Agreement and Non-Disclosure Agreement by misappropriating In2 confidential information and intellectual property, and by refusing to provide essential consideration, referred to in the agreements, in the form of volume of sales and orders.  Honeywell breached its promises to permit In2 to offer its products for sale through ADI and market In2 branded products.

45. Honeywell breached oral contracts not part of or inconsistent with the written agreements between In2 and Honeywell.  The oral contracts breached by Honeywell include agreements to sell at least 28,000 Vista ICM units, to transition Honeywell-branded Vista ICM to In2-branded ICM and to permit In2 to market its products and services, to continue selling Vista ICM systems, and to market and sell Energy ICM.  Honeywell did not honor any of these agreements.  These agreements

are not subsumed by any written agreement because none of these topics are covered by written agreements. To the extent a written agreement might apply, and none does, the agreement (*e.g.*, Bailment Agreement) is on its face ambiguous and incomplete and so not integrated or the recitals of the agreement refer to one or more of these promises as consideration for the written agreement.

## FIFTH CAUSE OF ACTION

**(Breach of the Covenant of Good Faith and Fair Dealing)**

46. In2 here incorporates paragraphs 1 through 45, inclusive, as though set forth in full.

47. Honeywell failed to deal with In2 fairly and abused and exploited its dominant position in the security marketplace. Honeywell acted with intent to deprive In2 of the value of the promises and agreements with Honeywell. Honeywell induced In2 to enter agreements and accept promises when Honeywell intended to ensure that the value of the agreements and promises would not be realized by In2 and could not be.

## PRAYER FOR RELIEF

In2 prays for judgment as follows:

A.　　Judgment in favor of In2 and against Defendant for monetary damages;

B.　　Pre- and post-judgment interest;

     C.     Costs of suit, including reasonable attorneys' fees; and

     D.     Such other and further relief as the Court may deem appropriate and just.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b), Plaintiff demands a trial by jury of all claims asserted.

Dated this 17th day of October, 2011.

**TELOS VG, PLLC**

_____
John H. Bogart R.
Lee Saber Attorneys
for Plaintiff

15

## CERTIFICATE OF SERVICE

I certify that on this 17th day of October, 2011, a true and correct copy of the foregoing was served upon the person(s) named below, at the address set out below the name, by automatic notice through the Court's electronic filing system.

Milo Steven Marsden
Dorsey & Whtiney LLP
136 S. Main, Suite 1000
Salt Lake City, UT 84101
marsden.steve@dorsey.com


Michael A. Lindsay
Kirsten Schubert
Dorsey & Whitney LLP
50 South Sixth Street
Minneapolis, MN 55402
lindsay.michael@dorsey.com


Attorneys for Defendants

                                            /s/ John H. Bogart